AUTOMATED MEDICAL LABORATO-RIES, INC., Plaintiff–Appellee Cross–Appellant,

v.

ARMOUR PHARMACEUTICAL COMPA-NY, Defendant–Appellant Cross–Appellee.

No. 79–3663.

United States Court of Appeals, Fifth Circuit.

Nov. 6, 1980.

---

Blackwell, Walker, Gray, Powers, Flick & Hoehl, James E. Tribble, James C. Blecke, Miami, Fla., Sidney S. Rosdeitcher, New York City, for defendant–appellant cross–appellee.

Larry A. Stumpf, Rochester, N. Y., for plaintiff–appellee cross–appellant.

Before HENDERSON, POLITZ and WILLIAMS, Circuit Judges.

POLITZ, Circuit Judge:

Automated Medical Laboratories, Inc. (Auto) operated several plasmapheresis centers and sold the plasma collected to Armour Pharmaceutical Company (Armour), a Phoenix–based business engaged in the purchase and processing of raw plasma for human medical needs. A dispute has arisen between the parties as to the validity, reach and breach of their agreement, as well as to damages sustained by each party and the peripheral issue of pre–judgment interest. After a bench trial, the district court (1) awarded Auto damages for breach of contract in the amount of $678,027.96, (2) awarded Armour damages on its cross–complaint for breach of contract in the amount of $109,644.51, and (3) awarded Auto pre–judgment interest and costs. We affirm in part, reverse in part, and remand.

We find little meaningful dispute in the material facts, although there is substantial dispute about their meaning and about the application of the controlling rules of law. Lloyd Rothenberg, President of Auto, and Ralph Eacret, the officer in charge of plasma purchases for Armour, had for several years entered into annual oral contracts by which Armour purchased essentially all of Auto's product. The oral agreements were followed by purchase orders which Armour sent Auto at the beginning of each year. Each month Auto shipped Armour the production from its collection centers.

Based on the relationship which existed between the parties, and assurances by Armour of its interest in purchasing all plasma produced, Auto undertook an expansion program which included the opening of five new centers.[1] By late 1974, Armour

---

1. Auto's first center, Plasma Corporation of America, in Miami, was purchased in 1972. Auto subsequently opened: (1) Orlando Plasma Corporation (Orlando, Florida, 1973); (2) Virginia Plasma Corporation (Norfolk, Virginia, 1973); (3) Richmond Plasma Corporation

was purchasing a minimum of 6,000 liters of plasma per month, the entire output of Auto's six plasmapheresis centers. By January 1975, Auto's monthly production capacity had reached 15,000 liters, a capability of which Armour was aware. On January 7, 1975, Armour issued a purchase order for calendar year 1975, calling for 3,000 liters per month of "Flash Frozen Plasma" at a price of $42.50 per liter. Because of the dramatic reduction in volume Rothenberg promptly called Eacret and they agreed to meet in Phoenix to resolve their differences. In late January 1975, Rothenberg, Eacret, and another representative of Armour, all met in Phoenix. Eacret succinctly detailed the results of that meeting, testifying:

> Well, as I recall, an agreement was reached where Automated Medical Labs would supply additional quantities of plasma on the purchase order [for the January to December 1975 period].

> [A]t the meeting, Mr. Rothenberg did mention a quantity of 8000 liters per month [and] *we agreed, verbally to purchase that quantity.* (Emphasis added.)

Between January 7, 1975 and mid–April 1975, Armour accepted delivery of and paid the agreed price for 26,884 liters. Also during this period, Armour informed Auto that it could no longer use "Flash Frozen Plasma," but would accept "Normal Fresh Frozen Plasma" at a price of $40.50 per liter. Auto's agreement to this modification was confirmed in writing.

In late March or early April 1975, Roger Bauer, Eacret's assistant, called Rothenberg to advise that Armour would no longer accept any shipments, citing an excessive inventory and no market. On April 25, 1975, Armour sent Auto the following telegram:

> AS DISCUSSED YOUR LAST PLASMA SHIPMENT TO ARMOUR UNTIL FURTHER NOTICE WILL BE DURING THE WEEK OF 4/21/75.

Armour never resumed purchases from Auto, who remained ready and able to sup-ply 8,000 liters per month. In an effort to mitigate its dilemma, Auto secured a German customer who purchased 2,000 liters per month, commencing June 28, 1975. Auto ceased collecting plasma at three of its centers.

In June 1975, Armour was informed by the Bureau of Biologics, Food and Drug Administration (the Bureau) that five units (approximately 3 liters) of plasma shipped from Auto's Orlando center in 1974 were possibly contaminated with hepatitis. Armour was also informed that plasma from both the Clearwater and Orlando facilities was under quarantine. Armour promptly notified Auto of this information and asserted that the questioned plasma did not conform to the warranty specifications of their purchase agreement.

After completing its investigation, the Bureau informed Armour that all plasma from Auto's Clearwater and Orlando centers which Armour had in process of manufacture as of June 6, 1975 was safe and could be sold. All such plasma "in process" had been shipped prior to January 1, 1975. Any resulting warranty breach, therefore, necessarily arose pursuant to the terms of the parties' 1974 contract and not the January 1975 Phoenix agreement.

Upon receiving approval from the Bureau on August 27, 1975, Armour tested over 28,000 units of the suspect plasma. Ninety–nine units of plasma tested "hepatitis positive." Armour incurred expenses totaling $109,644.51 in its program to sample, test, store, and care for the quarantined plasma.

After weighing the evidence adduced at trial, the district court held: (1) that the January 1975 "Phoenix agreement," requiring Armour to purchase 8,000 liters of plasma per month at $42.50 per liter, was a binding oral contract for the calendar year 1975; (2) that the contract price was mutually modified in March 1975 to $40.50 per liter; (3) that Armour breached and completely repudiated the contract in April 1975; (4) that Auto was entitled to recover

(Richmond, Virginia, 1974); (4) Plasma Corporation of New Orleans (New Orleans, Louisi-ana, 1974); and (5) Clearwater Plasma Corporation (Clearwater, Florida, 1974).

net damages amounting to $678,027.96, as well as pre–judgment interest on this award; and (5) that due to Auto's breach of warranty resulting from the hepatitis–contaminated blood, Armour sustained $109,-644.51 in damages, which amount was to be offset against Auto's damage recovery, resulting in a net award to Auto of $568,-383.45.

On appeal, Armour contends that the Phoenix agreement is not a binding contract because it violates the statute of frauds and that Auto is not entitled to pre–judgment interest because its damages are unliquidated. Auto insists that the contract is binding, that it is entitled to gross damages, rather than net damages, and it challenges the breach of warranty recovery awarded Armour.

*The Phoenix Agreement: Bad Contract as Well as Bad Blood?*

 U.C.C. § 2–201[2] provides that contracts for the sale of goods valued in excess of $500 are unenforceable unless in writing and signed by or for the respondent party.[3] Armour claims that the Phoenix agreement, providing for the· purchase/sale of 8,000 liters per month throughout 1975, is unenforceable under § 2–201 because it is not in writing.

 Invoking the statute of frauds is an affirmative defense which must be specially pled. Fed.R.Civ.P. 8(c). Although absolute specificity in pleading is not required, fair notice of the affirmative defense is. Fed.R. Civ.P. 8(f). Under the liberalized pleading guidelines codified in the federal rules, ample opportunity to amend pleadings exists with leave to be freely given. Fed.R.Civ.P. 15(a). Thus, while one wishing to assert an affirmative defense has every opportunity to do so, it must be done at a time and in a manner which is consistent with the language and spirit of the federal rules. The court and the opposing party must be timely advised of the intended defense.

2. U.C.C. § 2–201 provides:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods omitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received, and accepted (Sec. 2–606).

3. We wish to clarify and settle any choice of law issues. In diversity cases, district courts addressing conflict of law questions apply the rules of the forum state. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Florida law, issues concerning the nature, validity, and interpretation of contracts are governed by the lex loci; remedies are governed by the lex fori. *Wingold v. Horowitz*, 292 So.2d 585 (Fla.1974). Applying this rule, the Uniform Commercial Code, as adopted and interpreted in Arizona, governs questions of contract formation and the remedy questions, such as Auto's damage award, pre–judgment interest, and Armour's counterclaim for warranty breach, are governed by the Uniform Commercial Code as adopted and interpreted in Florida, considered together with other pertinent Florida rules. For convenience, we shall refer to the U.C.C. section enumerations rather than the Arizona and Florida references. The pertinent texts are identical.

In *Funding Systems Leasing Corp. v. Pugh*, 530 F.2d 91 (5th Cir. 1976), a virtual "goose case," we spoke to the time limitations for the assertion of a statute of frauds defense. The defendant in *Pugh* sought to raise this defense in a memorandum supporting his motion for summary judgment filed after entry of the pre–trial order. The pre–trial order, required by Fed.R. Civ.P. 16, listed all defenses, but made no reference to the statute of frauds. In rejecting the defendant's attempt to inject the defense at this stage, we stated:

> When the defendant has waived his affirmative defense by failing to allege it in his answer, or have it included in a pre–trial order of the district court that supersedes the pleadings, he cannot revive the defense in a memorandum in support of a motion for summary judgment.... We hold that appellant waived his [statute of frauds] argument by failing to affirmatively set forth this argument in a responsive pleading. Accordingly, the argument cannot be considered on appeal.

530 F.2d at 96.

Application of the *Pugh* rule to the instant case requires an examination of the parties' Pre–Trial Stipulation which contains the following topics: (1) Pleadings Raising the Issues, (2) Undecided Motions, (3) Stipulated Facts, (4) Facts Not Admitted But Requiring No Proof, and (5) Disputed Matters. There is no mention of a statute of frauds defense in the Stipulation. Under the heading "Pleadings Raising the Issues," Armour declares that all of its relevant pleadings are contained in a June 2, 1978 "Answer and Counterclaim" and a July 14, 1978 "Reply to Affirmative Defenses," neither of which contains any reference to the statute of frauds.

■ Armour first mentioned the statute of frauds in a one sentence comment in a Trial Memorandum filed shortly before trial. The reference was repeated in a motion for a directed verdict and in posttrial motions. As did the appellant in *Pugh*, Armour has waived any statute of frauds defense it may have had.[4]

### Breach of Contract

Having disposed of the statute of frauds issue, we consider whether the January 1975 meeting in Phoenix produced a binding contract and, if so, whether it was breached. The district court found that an agreement had been reached calling for the purchase/sale of 8,000 liters each month of 1975, for a price of $42.50 per liter, later adjusted to $40.50 per liter. These findings, insofar as they are findings of fact, are not clearly erroneous and are therefore affirmed. Fed.R.Civ.P. 52. The record clearly establishes the agreement; the extract from the testimony of Eacret quoted above reflects the understanding of the parties.

In resolving the breach issue, we note that Bauer's telephone call, later confirmed by telegram, clearly reflects Armour's repudiation of the Phoenix accord. U.C.C. § 2–610(c)[5] directs an aggrieved seller to § 2–704,[6] which in turn refers the seller to

---

4. Even if the statute of frauds defense were properly before the court, the testimony of Eacret would appear sufficient to exclude the agreement from the effects of the statute's prohibition because the contract was admitted in testimony in court. U.C.C. § 2-201(3)(b).

5. U.C.C. § 2-610 provides in part:
 When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
 (c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2 704).

6. U.C.C. § 2 704 provides:
 (1) An aggrieved seller under the preceding section may
 (a) identify to the contract conforming goods not already identified if at the time he learned of the breach they are in his possession or control;
 (b) treat as the subject of resale goods which have demonstrably been intended for the particular contract even though those goods are unfinished.
 (2) Where the goods are unfinished an aggrieved seller may in the exercise of reasonable commercial judgment for the purposes of avoiding loss and of effective realization either

§ 2–703 [7] and its panoply of available remedies including § 2–706,[8] (Seller's Resale Damages), and § 2–708,[9] (Seller's Damages for Non–Acceptance or Repudiation), both of which are applicable.

■ The district court made findings of fact that Auto made repeated but unsuccessful attempts to sell plasma after the

complete the manufacture and wholly identify the goods to the contract or cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner.

7. U.C.C. § 2 703 provides:
Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (Section 2 612), then also with respect to the whole undelivered balance, the aggrieved seller may
(a) withhold delivery of such goods;
(b) stop delivery by any bailee as hereafter provided (Section 2–705);
(c) proceed under the next section respecting goods still unidentified to the contract;
(d) resell and recover damages as hereafter provided (Section 2–706);
(e) recover damages for non–acceptance (Section 2 708) or in a proper case the price (Section 2 ·709);
(f) cancel.

8. U.C.C. § 2 706 provides:
(1) Under the conditions stated in Section 2 703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2–-710), but less expenses saved in consequence of the buyer's breach.
(2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.
(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell.

breach and ceased collecting plasma at each of its six centers. These findings are clearly erroneous and are rejected. Rothenberg testified that after the Armour breach his company sold 2,000 liters of Flash Frozen Plasma per month to Haemo–Med Company of Frankfurt, Germany. Rothenberg also testified that only the centers in Orlando,

(4) Where the resale is at public sale
(a) only identified goods can be sold except where there is a recognized market for a public sale of futures in goods of the kind; and
(b) it must be made at a usual place or market for public sale if one is reasonably available and except in the case of goods which are perishable or threaten to decline in value speedily the seller must give the buyer reasonable notice of the time and place of the resale; and
(c) if the goods are not to be within the view of those attending the sale the notification of sale must state the place where the goods are located and provide for their reasonable inspection by prospective bidders; and
(d) the seller may buy.
(5) A purchaser who buys in good faith at a resale takes the goods free of any rights of the original buyer even though the seller fails to comply with one or more of the requirements of this section.
(6) The seller is not accountable to the buyer for any profit made on any resale. A person in the position of a seller (Section 2–707) or a buyer who has rightfully rejected or justifiably revoked acceptance must account for any excess over the amount of his security interest, as hereinafter defined (subsection (3) of Section 2 711).

9. U.C.C. § 2 708 provides:
(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2 ·723), the measure of damages for non–acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–-710), but less expenses saved in consequence of the buyer's breach.
(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Clearwater and Miami were closed. The other three remained open.

■ Auto's "resale"[10] of 2,000 liters per month to the new customer beginning in June 1975, brings into play the provisions of § 2–706. The district court did not make findings of fact on the resale price or on the incidental expenses associated therewith. We remand in order that the court may make the relevant determinations. In making the calculations mandated by § 2–706, the district court is to use as the contract price the modified per liter price of $40.50.[11]

### Computation of Damages

■ Section 2–708 prescribes the appropriate formula for computing the damages for the unsold plasma.[12] The district court ruled that Auto was entitled to recover its net profit losses. Net profits are equal to the contract price per liter minus direct costs (payments to donors, costs of blood collection bags, and other costs specifically tied to the *volume* of output under a particular contract) and minus overhead costs (rent, static utility costs at plasma centers, and other costs incurred regardless of the *volume* of output). Auto asserts that it is entitled to recover gross profits. To calculate gross profits, one need only subtract direct costs from the contract price. In

that instance, the aggrieved seller would recover overhead costs in addition to net profits.

■ Florida law governs remedies, accordingly we defer to decisions by the Florida courts for the rules governing seller's lost profits under § 2–708(2). We find a dispositive decision involving the legal issue now before us, *Tech Corporation v. Permutit Company*, 321 So.2d 562, 563 (Fla.App. 1975), in which the court held:

> There is no dispute among the parties that if appellee is entitled to recover damages ..., § 672.708(2), F.S.1973, [U.C.C. § 2–708(2)] is applicable and appellee is entitled to recover its lost profit, including reasonable overhead.

The rule enunciated in *Tech* applies to the case at bar for as conceded in Armour's brief, at page 28:

> Automated relies on the principle that a seller is entitled to recover lost profits "including reasonable overhead." U.C.C. § 2–708(2). We do not quarrel with this principle....

Accordingly, we are confronted with the same situation as the Florida court in *Tech*. Because the parties before us are in obvious agreement, we proceed on the basis that § 2–708(2) includes reasonable overhead.[13] The district court erred in awarding Auto

---

**10.** Any suggestion that it is theoretically impossible to "resell" plasma not in existence at the time of the breach is neutralized by Official Comment 1 to § 2 706:
> [S]ubsection (2) [of § 2 706] authorizes a resale of goods which are not in existence or were not identified to the contract before the breach.

**11.** Although the court noted this price modification in its findings of fact and conclusions of law, it failed to specify whether it was basing its damage award on the unit price of $42.50 or $40.50. In applying the $40.50 per liter figure on remand, the district court must ascertain the impact this price reduction had on Auto's profits, for although the contract price was modified, the profit margin might have remained unchanged or been reduced by a sum less than $2 per liter.

**12.** For purposes of clarity we reiterate the salient figures. The 1975 contract called for the sale of 8,000 liters per month over a 12 month period, or 96,000 liters. Armour purchased 26,884 liters in 1975 prior to the breach. Auto

resold 2,000 liters per month to the Haemo Med Company, beginning in June 1975. It is unclear whether Auto resold 12,000 liters or 14,000. Based on these figures, Auto is entitled to § 2 708(2) damages on either 55,116 liters (96,000 less 26,884 less 14,000) or 57,116 liters (96,000 less 26,884 less 12,000). This analysis assumes that the sale to Haemo Med Company was at least as profitable as the sale to Armour.

**13.** As noted in the text, the parties in this case interpret § 2 ‑708(2) as entitling a seller to reasonable overhead as a component of lost profits. We accept this position of the parties in resolving their dispute. Because of the posture of the parties we take note of but we need not and specifically do not adopt the rule of *Vitex Manufacturing Corp. v. Caribtex Corp.*, 377 F.2d 795 (3d Cir. 1967), to the effect that § 2 708(2) always entitles a seller to recover reasonable overhead expense as an element of the damage award. We defer resolution of that issue to the case in which it is presented to us as a disputed issue.

net profits. In light of the foregoing discussion, and giving substantial weight to the agreement of the parties on this issue, we conclude that Auto is entitled to gross profits, which includes the net profit element and an overhead expense element. In calculating the overhead component, we remind the district court of the teaching of the *Tech* court:

> The proof of lost profits and the allocation of overhead to a specific job is at best difficult. The proof concerning the amount of lost profits need only be reasonably certain to permit recovery thereof.

321 So.2d at 563.

■ The allocation of overhead is particularly problematic because three centers remained open after the breach. The record is unclear as to what extent they remained open to service the Haemo–Med account. Auto's 1975 overhead costs are not recoverable to the extent they were incurred in servicing a current client. On remand, the court must examine Auto's 1975 records to determine actual overhead expenses for 1975. Because Auto closed three centers after the Armour breach, its overhead expenses in 1975 may very well have varied considerably from the expenses incurred in previous years. While mathematical certainty in proving damages is not required,[14] the considerations highlighted above are of major significance, as may be others later found appropriate, and must be evaluated by the district court before determining the damage award due Auto.

### Pre–Judgment Interest

The Florida Supreme Court spoke to the question of pre–judgment interest in breach of contract cases in *Parker v. Brinson Construction Company*, 78 So.2d 873, 874 (Fla. 1955):

> This Court has long recognized that in actions ex contractu it is proper to allow

interest at the legal rate from the date the debt was due. *Sullivan v. McMillan*, 37 Fla. 134, 19 So. 340, 53 Am.St.Rep. 239; *McMillan v. Warren*, 59 Fla. 578, 52 So. 825. The fact that there is an honest and bona–fide dispute as to whether the debt is actually due has no bearing on the question. The rule is that if it is finally determined that the debt was due, the person to whom it was due is entitled not only to the payment of the principal of the debt but to interest at the lawful rate from the due date thereof.

*Accord, Hatch v. Minot*, 369 So.2d 974 (Fla. App.1979); *Peter Marich & Associates, Inc. v. Powell*, 365 So.2d 754 (Fla.App.1978).

■ The pivotal question is whether Armour's debt to Auto was fixed, certain, and therefore liquidated. Answering this question in the affirmative, we hold that Auto is entitled to pre–judgment interest on its final damage award as calculated on remand.[15] Armour's contract obligation to Auto was fixed on the date in late January 1975 when the parties met in Phoenix and reached an agreement calling for twelve monthly shipments of 8,000 liters each. Armour's debt to Auto was certain: originally, the contract price was set at $42.50 per liter, later adjusted by mutual agreement to $40.50 per liter.

Auto's claim against Armour is liquidated because the dates of contract formation and breach are established, the quantity sold is fixed, as is the contract price. Awarding Auto gross profits, including reasonable overhead costs, does not change our conclusion on this issue. See *Tech*, 321 So.2d at 563–64. Contrary to Armour's contention, we are not faced with a situation where "the amount of the damages cannot be computed except on conflicting evidence, inferences and interpretations." *Town of Longboat Key v. Carl E. Widell & Son*, 362 So.2d 719, 723 (Fla.App.1978).

---

14. *See Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16 (5th Cir.), *cert. denied*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974), and cases cited therein.

15. Armour insists that any pre‑judgment interest award granted to Auto should be calculated

after deducting the Armour counterclaim award. We disagree. Interest on Auto's recovery will be calculated on Auto's gross profit damage award. Armour's counterclaim award is separate and independent from Auto's damage award and has no bearing.

Auto is entitled to recover pre–judgment interest at a rate of six percent per annum as provided in Fla.Stat. § 687.01.

### Armour's Counterclaim

Damages amounting to $109,644.51 were awarded to Armour as reimbursement for expenses incurred in testing and storing quarantined plasma suspected of being infected with hepatitis. Auto contends that Armour's counterclaim is barred because it failed to reject or revoke the contract in accordance with U.C.C. §§ 2–606 and 2–608. Auto's reliance on these provisions is misplaced because it is beyond dispute that Armour accepted the questioned plasma and did not attempt to revoke the 1974 contract. As an aggrieved buyer, Armour is protected both by § 2–314[16] (Implied Warranty of Merchantability) and § 2–315[17] (Implied Warranty of Fitness for a Particular Purpose). The implied warranty of merchantability was breached when Auto failed to suitably screen the plasma for hepatitis. The plasma was not "fit for the ordinary purposes for which such goods are used." § 2–314(2)(c). Further, Armour gave Auto an implied warranty of fitness for a particular purpose. All purchase orders sent to Auto by Armour stated that Auto had agreed to screen for hepatitis. Quite obviously, Armour knew that the plasma would be used on human patients and, therefore, had to be "hepatitis negative." Armour was relying on Auto, with its fully equipped collection centers and labs, to check all plasma for any trace of hepatitis. The particular purpose fitness warranty was also breached.

Auto attacked the award of counterclaim damages on several other grounds. Our examination of the record discloses no merit in any of these and, accordingly, all are rejected.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for such further proceedings as the district court may deem appropriate and, thereafter, entry of judgment not inconsistent herewith.

---

**16.** U.C.C. § 2 314 provides:

(1) Unless excluded or modified (Section 2 316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade.

**17.** U.C.C. § 2–315 provides:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.