7 F.3d 238
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Ronnie DOERGE, d/b/a National Learning Systems, Plaintiff-Appellee,
v.
NEW DIMENSIONS IN EDUCATION, INCORPORATED, a Delaware
Corporation, Defendant-Appellant.
 No. 92-3663.
 United States Court of Appeals, Seventh Circuit.
 Argued April 6, 1993.
Decided Sept. 21, 1993.
 
 Before RIPPLE and MANION, Circuit Judges, and ENGEL, Senior Circuit Judge.*
 
 ORDER
 
 1
 Ronnie Doerge sued New Dimensions in Education, Inc. for breach of an employment contract. A jury found in favor of Doerge. New Dimensions appeals, arguing that the evidence shows that they never reached an agreement, and that the jury's damage award was not supported by the evidence. New Dimensions also asks for a new trial because of improper remarks made by Doerge's counsel during closing argument. We reject these arguments in turn, and affirm the decisions of the district court.
 
 I. Background
 
 2
 New Dimensions developed and marketed educational programs and material. The company sold its products through a network of independent dealers and sales representatives. Doerge had been an independent dealer for New Dimensions and its predecessors since 1970. He sold educational programs and materials in Southern Illinois and Kentucky. Dealers marketed the products, maintained their own warehouse of inventory, and billed customers directly. By purchasing materials at a 35%-40% discount, dealers were able to profit from a substantial mark-up. Sales representatives, in contrast, received a straight 25%-30% commission. In this particular industry, a new product could take as much as five or more years on the market before proving profitable. Thus dealers risked building a customer base for a particular product only to have the company displace him in favor of a sales rep. To avoid this possibility, on January 13, 1981, Doerge negotiated a dealer contract with New Dimension's predecessor, Arista Corporation.
 
 
 3
 The written contract was performance-based. It had a one-year term, renewable if Doerge met his assigned quota for the previous year and represented Arista in a professional manner. Near the end of the calendar year, the company would never say "Your contract is renewed for another year." Rather, the sales manager would telephone Doerge and they would dicker over the next year's quota. Or the sales manager would communicate the quota in person at one of the national sales meetings. Once Arista and Doerge agreed on the quota, the contract was renewed for the ensuing year. This occurred each year from 1982 through 1987. Simply put, if Doerge continued to perform as expected, he was guaranteed the opportunity to sell the products and the contract would be renewed for at least another year. By 1988, the company sold most of its products through sales reps; Doerge was the only dealer remaining. In September 1987 New Dimensions bought out Arista and renewed Doerge's contract for 1988. At issue in this case is whether New Dimensions thereafter renewed his contract in 1989.
 
 
 4
 After New Dimensions took over the operation, Doerge notified the company that he would take an extended vacation. From April 19 to October 6, 1988, he visited Europe, North Africa, Asia and the British Isles. Needless to say, sales dropped dramatically. By October his business had accounted for only $43,824.64 toward a 1988 quota of $265,000.00. New Dimensions as a whole also was not doing well that year, as many sales reps had failed to meet their quotas. On November 21, 1988, Doerge flew to New York and met with Richard Rubin, New Dimensions' chief executive officer, Phil Hamerslough, its president, and vice presidents Stanley Miles, David Traynor and Raymond Haynes. The parties have not disputed that Doerge failed to meet his 1988 quota, giving New Dimensions the option of not renewing the contract. But New Dimensions did not want to lose Doerge completely. Because of Doerge's dismal performance for 1988, Rubin wanted to change Doerge's status from a dealer to a sales rep. The New Dimensions officers testified that Rubin made it very clear to everyone attending the November 21 meeting that only Rubin would make the decision to renew any contract. The question at trial was whether there was a contract and if so, whether it was breached.
 
 
 5
 Doerge's theory of the case was that David Traynor, vice president and sales manager, agreed in a December 1988 telephone conversation to renew the 1981 dealer contract for the year 1989. Since the company did not honor that agreement, Doerge claimed damages for breach of contract. A jury agreed and awarded Doerge $145,000 in damages. New Dimensions moved for judgment notwithstanding the verdict, a new trial, and remittitur of damages. New Dimensions argued that the evidence showed that Traynor had no apparent authority to renew the dealer contract. The district court concluded otherwise. New Dimensions also argued that the parties' correspondence between December 19 and 22 shows that no contract was entered. Doerge asserted that he accepted a $100,000 quota from Traynor in early December, as reflected in a letter to Rubin on December 19. Rubin sent a letter to Doerge on December 22 stating flatly that the dealer contract would not be renewed. Doerge, however, sent a letter to Rubin on December 29 purporting to accept a $160,000 quota. The district court did not directly rule on this issue of timing. New Dimensions also raised arguments regarding damages, the statute of frauds and the plaintiffs' closing argument. The court denied these motions as well and this appeal follows.
 
 II. Discussion
 
 6
 The district court had diversity jurisdiction; Doerge domiciled in Illinois and New Dimensions incorporated in Delaware with its principal place of business in New York. See 28 U.S.C. 1332. The parties do not dispute that under choice of law principles, Illinois law applies in this case. Under Illinois law the court should grant judgment notwithstanding the verdict only if "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based upon that evidence could ever stand." Pedrick v. Peoria & Eastern R.R., 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-14 (1967). See Dolder v. Martinton Township, No. 92-1705, slip op. at 3 (7th Cir. July 8, 1993).
 
 A. Evidence of a Contract
 
 7
 1. Apparent authority.
 
 
 8
 New Dimensions argues not only that the parties had not entered into a binding contract, but also that the overwhelming evidence shows that Traynor had no apparent authority to renew Doerge's 1981 dealer contract in the first place. Apparent authority is such authority as a reasonable person would suppose an agent to possess in view of the principal's conduct. Malcak v. Westchester Park Dist., 754 F.2d 239, 245 (7th Cir.1985). In other words, would Doerge, as a reasonably prudent person, have thought New Dimensions held Traynor out as having the authority to renew the dealer contract?
 
 
 9
 Doerge testified that since 1981 he had annually received new quotas from the sales manager. Although Traynor testified that he did not actually set the quotas, he also testified that as far back as 1981 he was the one who communicated the quotas to the dealers. Given Traynor's status as vice president and the custom and the practice of the company to communicate new quotas through the sales manager, the jury was entitled to believe that a reasonable person would suppose that New Dimensions had cloaked Traynor with the authority necessary to renew the dealer contract.
 
 
 10
 New Dimensions argues that any apparent authority Traynor might have had was terminated by Rubin's statements at the November 21, 1988 meeting in which Doerge was told that only Rubin could make a final decision. See Malcak, 754 F.2d at 245 ("When a person has notice of the agent's lack of authority, belief that the agent has apparent authority is unreasonable."). Although the New Dimensions officers who were in attendance at that meeting testified to this fact, the defense counsel never asked Doerge on cross examination, or otherwise, whether he had heard or understood that Rubin was the only one able to make a deal. It is possible that Rubin made certain statements that Doerge did not hear or properly interpret. The jury was permitted to entertain this possibility when on direct examination Doerge testified about the November meeting as follows:
 
 
 11
 Question: Did anyone say to you that you would not receive new quotas from Dave Traynor?
 
 
 12
 Answer: No, sir.
 
 
 13
 Plaintiff's counsel likewise did not press the ultimate question of what Doerge had heard from Rubin. But the jury could have inferred from this testimony that if Doerge understood that Traynor could still give him a new quota, Rubin must not have removed such authority.
 
 
 14
 Traynor testified that at the November meeting "Mr. Rubin stated flatly that any future negotiations or relationships would be done directly with him." Yet within a few days he was on the telephone with Doerge discussing the sales rep position and negotiating an alternative contract. Rubin admitted knowing about their conversations and consented to negotiations.
 
 
 15
 Rubin's testimony also calls into question whether Traynor's authority was somehow diluted. He testified that at the November meeting he stated that only he could make a decision to renew Doerge's contract. But he also testified that Traynor was still charged with communicating to salespeople. The jury was entitled to find that a reasonable person would believe that any quota received from Traynor was with the approval of Rubin. Because Traynor was Rubin's mouthpiece, we do not think it unreasonable for Doerge to have believed that a vice president serving as a communication link between the dealer and chairman of the board had no apparent authority to renew a contract. Rubin also testified as follows:
 
 
 16
 Question: And you knew that Dave Traynor was discussing quotas with Ron Doerge in December of 1988?
 
 
 17
 Answer: Yes, that's correct. Quotas for a rep position, not a quota for a dealer.
 
 
 18
 Question: You knew he was discussing quotas with Ron Doerge, didn't you?
 
 
 19
 Answer: Yes.
 
 
 20
 Notwithstanding his statements at the November meeting, Rubin admits that Traynor was allowed to negotiate a sales rep contract with Doerge. This runs contrary to the defense's theory of the case that Rubin had made himself out to be the only one who could close any deal. From this the jury was entitled to wonder how Doerge could know the difference when discussing the details of his status for the next year. By showing that Traynor had the authority to make some kind of deal, and that Rubin approved, the jury was entitled to infer that Doerge, as a reasonable person, would see Traynor as having authority to renew the dealer contract as well.
 
 
 21
 2. Offer and acceptance.
 
 
 22
 New Dimensions next argues that assuming Traynor had apparent authority, he made no offer nor did Doerge accept. The evidence is to the contrary. New Dimensions does not dispute that Doerge had a valid contract in 1981. To renew that contract each year, all that remained was for New Dimensions to offer Doerge an acceptable quota. Doerge testified that Traynor telephoned him in early December and offered him a quota of $100,000, which Doerge "graciously accepted." On December 19, Doerge also sent a letter to Rubin accepting the $100,000 quota. On December 22, Rubin responded stating that New Dimensions was "unwilling to continue the agreement of January 13, 1981."[1] On December 29, Doerge sent another letter to Rubin acknowledging that the quota was $160,000, not $100,000. New Dimensions argues that the timing of these letters shows that the parties never agreed to renew the dealer contract.
 
 
 23
 New Dimensions argues that if Traynor orally offered to renew the contract in early December for a $160,000 quota, Doerge's purported acceptance of a $100,000 quota by letter of December 19 amounts to a repudiation of the offer. Likewise, if Doerge's December 19 letter was a counter-offer for a $100,000 quota, New Dimensions explicitly refused to renew any contract by its letter of December 22. These arguments assume, however, that Doerge and Traynor did not talk to each other and agree on the $160,000 quota between December 19 and 22.
 
 
 24
 The record leaves some gaps and possible conflicts as to who said what, when. Some of these gaps could have been filled with more comprehensive examination of the witnesses by both the plaintiff's and defendants' attorneys. But we examine the record as is. Given that record evidence we must determine whether the jury's conclusion that there was a contract and that New Dimensions breached it was plausible. Pedrick, 229 N.E.2d at 513-14.
 
 
 25
 Traynor testified that he discussed the $160,000 quota with Doerge sometime after December 12. This conversation apparently took place after Doerge told vice president Raymond Haynes that his 1989 quota from Traynor would be $100,000. Haynes in turn told Traynor that the quota was too low. The record allows the jury to conclude that Doerge's conversation with Haynes could have occurred around the time Doerge wrote his December 18 letter to Rubin accepting the $100,000 quota. The jury could also conclude that immediately after the conversation with Haynes, Traynor contacted Doerge and corrected the quota to the $160,000 level. Doerge thought that would be okay. Subsequently Doerge received Rubin's December 22 letter canceling the 1981 agreement. Thus the jury could reasonably determine that there was an initial offer of a renewed contract with a $100,000 quota ("graciously accepted") with a corrected quota offer of $160,000 ("that's okay") followed by a cancellation of that contract ("unwilling to continue the agreement").
 
 
 26
 New Dimensions asserts that Traynor's telephone records show that Traynor and Doerge did not talk between December 19 and 22. The jury, however, was left with the impression that all of Traynor's telephone records were not produced and, even assuming they were, Doerge could have telephoned Traynor. Thus, the jury could have found that the parties renewed the contract with a $160,000 quota.
 
 
 27
 New Dimensions also mischaracterized the effect of any change in quotas. The parties do not dispute that an offer is rejected by a counter-offer. But Doerge's letters do not purport to be counter-offers, but acceptances. The jury could have found that Doerge accepted the $100,000 quota and based its damages accordingly. Or it could have based its damages on a $160,000 quota. The contract appeared to be first offered and accepted at the $100,000 level. Even then Doerge was apparently willing to accept a quota increase from $100,000 to $160,000. Close examination or cross-examination of one or more of the witnesses could have cleared up seeming inconsistencies in the testimony. With the record in its present state, however, the jury could reasonably have found that New Dimensions, after offering Doerge a contract, which he accepted, canceled it, causing the breach.
 
 B. Damages
 
 28
 The court instructed the jury that if it found in favor of Doerge, it could award net profits as damages. See Alover Distribs., Inc.. v. Kroger Co., 513 F.2d 1137, 1140 (7th Cir.1975) (compensation should place the injured party in the same position had the breach of contract not occurred). We can overturn the jury's finding if damages are excessive or irrational. See Joan W. v. City of Chicago, 771 F.2d 1020, 1023 (7th Cir.1985). Doerge testified that his net profit would be 70% of his gross profit, which would be 50% of the quota. Given a quota of $160,000, his gross profit could have been $80,000 and net profit $56,000 for the year 1989. If Doerge had met his quota in 1989, the contract would have been renewed for the following year, and so forth. Thus, the jury, by awarding Doerge $145,000, must have concluded that he would have met his quotas in the near future. Such an award was reasonable.
 
 C. Statute of Frauds
 
 29
 New Dimensions argues that its oral contract was not enforceable due to the statute of frauds. It focuses on the fact that when the parties renewed the dealer contract for the year 1989, all of the discussions were over the telephone. But New Dimensions conveniently ignores the fact that the 1981 dealer contract was in writing. To renew the contract either Doerge could meet his quota or the parties could agree on a new one. New Dimensions cites no case where a written contract runs afoul of the statute of frauds because it is renewed orally. In any event, the issue was waived.
 
 
 30
 New Dimensions did not raise the statute of frauds in its answer. This violates Federal Rule of Civil Procedure 8. New Dimensions first raised the issue in one sentence of its summary judgment motion filed three weeks before trial, and then at the close of the plaintiff's case. The district court found the argument untimely. We agree. This case is remarkably similar to Automated Medical Laboratories, Inc. v. Armour Pharmaceutical, 629 F.2d 1118, 1122-23 (5th Cir.1980), cited by Doerge. There the court held that a defendant cannot first mention the statute of frauds "in a one sentence comment in a Trial Memorandum filed shortly before trial" and provide fair notice of the affirmative defense. Id. at 1123. New Dimensions has made no attempt to distinguish the cases, so neither will we.
 
 D. Closing Argument
 
 31
 New Dimensions argues that plaintiff's counsel during closing argument appealed to local bias, and that counsel pronounced the defendants' names with a Jewish accent in order to appeal to any anti-Semitic feelings of the jurors in obtaining his verdict. The district court found that the "us-against-them" statements were improper but not "so egregious as to require a new trial." The court also found that counsel did not attempt in any way to invoke anti-Semitic prejudice. New Dimensions did not object to counsel's statements at the time they were made, but only in post-trial motions. Thus, the court had no opportunity for a curative instruction if defense counsel thought one was necessary. As such, these arguments were waived. See DeRance, Inc. v. Painewebber, Inc., 872 F.2d 1312, 1326 (7th Cir.1989). The district court did not err in refusing to grant a new trial on issues it was not permitted the opportunity to review and if necessary to correct.
 
 III. Conclusion
 
 32
 This was a classic jury case. Doerge testified that Traynor renewed his dealer contract; New Dimensions mounted its case in opposition. Reasonable people could have found the contract renewed and damages of $145,000. Where the plaintiff's counsel makes questionable statements in closing argument, the place to complain is before the district court at the time, not a year later on appeal. We decline the invitation to replace the jury's findings with our own. The district court acted appropriately and we AFFIRM in all respects.
 
 
 
 *
 Hon. Albert J. Engel, Senior Circuit Judge for the Sixth Circuit, is sitting by designation
 
 
 [1]
 Doerge alleged in his Second Amended Complaint that New Dimensions terminated the contract by the December 22 letter